UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

     v.                                      Criminal No. 07-cr-49-01-SM
                                            Opinion No. 2007 DNH 145
<u>Anthony R. Capobianco</u>

## **O R D E R**

After careful consideration of the matter, defendant's
motion to suppress incriminating statements he made to federal
law enforcement officers during a custodial interrogation is
denied.

## **Background**

After a criminal investigation, federal law enforcement
officers concluded that defendant, a convicted felon, attempted
to buy a Sig Sauer pistol from Stateline Guns, Ammo and Archery
("Stateline"), in Plaistow, New Hampshire.  In connection with
that attempt, defendant allegedly completed and signed ATF Form
4473, on which he falsely represented that he had never been
convicted of a felony.  And, on the same form, defendant also
allegedly represented that a social security number assigned to
his father (also named Anthony Capobianco) was his own.  Because
Stateline's records check disclosed defendant's disqualifying

felony background, it declined to sell the firearm to him.
Defendant was subsequently indicted for making a false statement
in an attempt to acquire a firearm, in violation of 18 U.S.C.
§ 922(a)(6), and for falsely representing that a social security
number was his own, in violation of 42 U.S.C. § 408(a)(7)(B).

After the indictment was returned and an arrest warrant
issued, ATF agents went to the home of defendant's parents at
approximately 7:30 a.m. on February 8, 2007, seeking information
about him.  While there, Special Agent DeSantis noticed defendant
as he left a nearby building, apparently about to drive his
daughter to school.  Defendant was promptly taken into custody.
After being allowed to get a coat and make arrangements for his
daughter's transportation to school, defendant was placed in the
back of a car and taken to the federal courthouse in Concord for
an initial appearance.

While in transit, and before questioning defendant, Special
Agent Cook advised him of his _Miranda_ rights, and obtained both
an oral and written waiver from defendant.  After acknowledging
and waiving his rights, defendant consented to questioning.

Although defendant asked why he was being arrested, the agents did not inform him of the actual charges underlying his arrest.  He was only told that an arrest warrant had been issued.  Special Agent Cook then engaged in a form of deception and trickery, telling defendant, falsely, that a firearm that had been used in a shooting in Manchester, New Hampshire, had been recovered by police and traced back to him through a federally licensed dealer.  Defendant was also told, falsely, that someone had been shot with that firearm and, although it looked like he was going to recover, the victim was in the hospital.  In reality, there was no shooting, no victim, and no recovered firearm.

Defendant was generally calm and relaxed, given the circumstances of his arrest, and his demeanor remained so during questioning.  Upon hearing Cook's tale, rather than becoming outwardly agitated or concerned, defendant immediately declared that he was "relieved," saying he thought it was "something more than that."  He volunteered that he had tried to buy a firearm from Stateline, but was unsuccessful.  Special Agent Cook then showed defendant the Form 4473 and said, in substance, ". . . do you mean you didn't get that firearm?  I have the 4473 report here that you completed.  [Aren't] these the blocks you filled

3

out?"  Defendant admitted that he had completed the ATF form, and
put his father's social security number down as his own, but
reiterated that the dealer did not actually sell the firearm to
him.

It is, perhaps, important to take note of what Special Agent
Cook did not say.  Defendant was not told that the fictional
victim died, or was likely to die, or that a homicide or murder
investigation was underway, or might be likely.  Nor was
defendant told that he was suspected of being the fictional
shooter, or that he was potentially facing the death penalty or a
life sentence.  Although defendant's affidavit identifies
dramatic and imaginative possibilities, his calm demeanor at the
time the ruse was perpetrated, and his statement that he was
"relieved" to hear Cook's tale, undermine his current claim of
anxiety and coercion.  I find that he was not anxious,
frightened, or overly concerned about any implication that he
might be held liable with respect to a shooting.  To the
contrary, he was relaxed, calm, and conversational.  Defendant
well knew that he never obtained the firearm from Stateline that
was supposedly "traced back" to him, so had no involvement in the
fictional shooting, and nothing was said by the officers that
could be thought of as accusatory pressure.  There were, of

4

course, other explanations for the claimed link between the
defendant and the firearm that would not have involved him in the
fictional shooting: the firearm might have been stolen or lost
after purchase, or loaned, or sold, or, as defendant stated,
never obtained — none of which would have exposed the defendant
to any criminal liability.  Defendant's claim that he was coerced
into making inculpatory statements by the implication that he
could be facing a life sentence or even the death penalty for his
role in the fictional shooting is a stretch and not credible.

The ruse perpetrated by Special Agent Cook did not force
defendant to choose between admitting the relatively minor
offenses of making false statements and misrepresenting another's
social security number as his own, on the one hand, or risk
prosecution and possible wrongful conviction of some undefined
and completely unrelated but far more serious crime, on the
other.  The ruse explained why the officers took defendant into
custody — a firearm was traced back to him that was involved in a
serious matter — and put in a serious context, albeit a false
one, reasons why defendant might choose to answer questions
credibly and admit his actual connection to the firearm at issue.

Ruses, deception, and trickery have, for better or worse, become almost standard practice in police interrogation.  But, while "trickery can sink to the level of coercion . . . . [it] is a relatively rare phenomenon."  <u>United States v. Flemmi</u>, 225 F.3d 78, 91 n.5 (1st Cir. 2000).  The critical issue with respect to this suppression motion is whether the government has met its burden to prove that, under the totality of the circumstances, defendant's statements to Special Agent Cook were the product of a free and deliberate choice, rather than the product or coercive official tactics, making them involuntary.  <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>see</u> <u>also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986); <u>United States v. Jackson</u>, 918 F.2d 236, 242 (1st Cir. 1990); <u>Bryant v. Vose</u>, 785 F.2d 364, 367-68 (1st Cir. 1986). Only confessions procured by coercive official tactics should be excluded as involuntary.  <u>United States v. Byram</u>, 145 F.3d 405, 407 (1st Cir. 1998); <u>Flemmi</u>, 225 F.3d at 91.

"[S]ome types of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate."  <u>Byram</u>, 145 F.3d at 408 (citing <u>Lynumn v. Illinois</u>, 372 U.S. 528, 534 (1963) (police threatened removal of defendant's children if she did not cooperate)).  But, "[o]f the

6

numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992).  It is a matter of degree — the degree of improper coercion and the extent to which the deception employed by officers interjected the kind of extrinsic considerations that would overcome a defendant's will by distorting an otherwise rational choice of whether to confess or remain silent.  Id.

I find that the government has met its burden in that regard and established the voluntariness of defendant's statements by a preponderance of the evidence.

Although defendant was not informed of the specific charges underlying his arrest, he was told that an arrest warrant had been issued and that he was being arrested pursuant to that warrant.  He was fully advised of his Miranda rights; he said he understood them (defendant has prior experience with the justice system); he waived those rights, both orally and in writing; and said he was willing to answer questions.  When informed of the false reasons for the officers' action, he did not exhibit signs of the kind of duress or fright or consternation or fear or anxiety that might prompt him to say or do whatever was necessary

7

to avoid what he posits was a possible "life sentence" or the "death penalty" or even very serious trouble.  I credit the testimony of Special Agent Cook, and not defendant's affidavit with respect to what occurred in the car.

Ironically, perhaps, while Special Agent Cook's ruse seemingly worked, it apparently did not work as intended. Defendant wasn't led to confess after anguishing over an impossible choice and reflecting on the implicit dire consequences peddled by Special Agent Cook.  Rather, he confessed, oddly enough, because he was "relieved" to learn that the reason for the officers' presence was only the supposed shooting of a victim with a pistol traced back to him, and not "something more than this" (one can only guess what "something more than this" might have been that, in defendant's mind, was of greater concern to him than the representation that a firearm used in a shooting had been traced back to him).  See, e.g., United States v. Kruger, 151 F. Supp. 2d 86, 107 (D. Me. 2001) (noting that demeanor of defendant "did not indicate that he felt coerced in any way").

Defendant's explanation that he was not involved in the fictional shooting incident because he never purchased the

8

firearm in question was quick, responsive, and, of course was
true and not particularly inculpatory.  That he proceeded to
acknowledge and confirm his completion of the ATF Form, including
his signature, the false social security number, and other
identifying information, was the product of trickery, perhaps,
but not trickery of a type or to a degree that sank to the level
of coercion that would render his statements involuntary and
inadmissable.  It was only when Special Agent Cook presented the
ATF form and implied it was inconsistent with his explanation
that defendant "bit," conceding that he filled out the form.

     The ruse employed by Special Agent Cook involved deceptions
that, arguably, were somewhat attenuated from the crimes charged,
but they were not completely unrelated.  The fiction that the
firearm had been "traced back" to defendant was directly related
to the crimes charged — the means of "tracing" being the very
form upon which defendant made material misrepresentations in an
effort to unlawfully obtain the firearm.  The "extrinsic"
consideration in the ruse, if it was one — i.e., the allegedly
engendered fear of greater trouble — might, under other and far
more dramatic circumstances, warrant a finding of coercion, but
not here.  At a minimum, a targeted defendant would have to be
actually coerced by the deception.  That is to say, his will to

remain silent would have to be overborne by the tactic of putting an untenable choice to him, as in <u>Lynumn</u> (confess or lose custody of your children).  Here, defendant was not actually coerced; he was, curiously enough, actually relieved to hear the tale spun by Cook.

    To be sure, Special Agent Cook's ruse was of a different kind than the usual exaggeration of inculpatory evidence available to the police — suggesting, for example, that others have confessed and implicated the defendant, and the like.  It may have been a ruse heading in the general direction of the line between acceptable deception and coercion, but it did not reach (and certainly did not cross over) that line.  Given defendant's calm and relieved reaction to the ruse, and the deception's relatedness to the actual charges, and the ambiguity of the implied connection between the fictional shooting and defendant, I find that the deception employed, while certainly subject to legitimate criticism, did not interject the kind of completely extrinsic consideration, unrelated to the crimes charged, that would, or did, overcome defendant's will by distorting an otherwise rational choice to remain silent or confess.  And, I find that this defendant's will was not overborne; he was not actually coerced.  Defendant's statements were made under rather

10

benign interrogation conditions, after <u>Miranda</u> warnings had been given, which he understood, and which he expressly waived.  <u>See generally</u>, 18 U.S.C. § 3501(b).

Finally, I do not find that the government's conduct of the interrogation amounted to outrageous misconduct so shocking to the conscience as to violate defendant's right to substantive due process.  <u>See</u> <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952).  It was a ruse, but it was carried out in a benign atmosphere, was somewhat ambiguous in its implication, defendant was not actually coerced, and defendant understood he was free to stop talking at any time.  <u>See</u> <u>Byram</u>, 145 F.3d at 408-409.

## Conclusion

Under the totality of the circumstances, defendant's statements to Special Agent Cook were voluntary.  That is, they were the product of a free and deliberate choice, rather than coercive official tactics or intimidation.  Defendant's Motion to Suppress Statements (document no. 15) is, therefore, denied.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

November 30, 2007

11

cc:  Helen w. Fitzgibbon, AUSA
     Peter C. Horstmann, Esq.
     Timothy E. Bush, Esq.
     Jonathan R. Saxe, Esq.
     U.S. Probation
     U.S. Marshal